Commissioners of Miama Co. v. Wan-zop-pe-che *et al.*

*Error from Miami County.*

The treaty with the Miamis, of June 5th, 1854, after providing, similar to that with the Shawnees, that Congress may authorize the issuing of patents for the selected lands under restrictions, provides that the lands so patented "shall not be liable to levy, sale, execution or forfeiture." The patents contain the restriction that said lands shall never be sold or conveyed by the grantee or his heirs, without the consent of the Secretary of the Interior for the time being, the same as the restrictions in the patents to the Shawnees.

Commissioners of Miami County v. Wan-zop-pe-che and others.

When used with reference to judicial proceedings in civil matters, the words "levy and sale" are equivalent to the word "execution," and each expression means the subjecting of property to the satisfaction of a judgment. *Semble*, exemption from "taxation" would include exemption from sale for taxes.

Taxes, like a judgment, are a mere lien upon land to be enforced by sale, and the title passes and can pass by sale alone; there can be no redemption until after sale. A tax sale is in no sense a forfeiture within the meaning of that word as used in the treaty with the Miamis, and that word can have no application to taxation.

The words "levy, sale, and forfeiture" used therein have reference to judicial proceedings alone. *Held* that the head-rights of the Miamis are taxable under the state laws.

The facts in this case were similar to the facts in the preceding case of Blue-Jacket *v.* The Com'rs of Johnson County, the only difference in the two cases being the different wording of the treaties in the respect indicated in the subjoined opinion of the court. The two cases were submitted at the same time and considered together. The briefs and arguments in the preceding case were used in this with some additions indicated below. A perpetual injunction on the collection of the taxes was granted by the court below and the case brought here to reverse that order.

*W. R. Wagstaff & S. O. Thacher,* for plaintiff in error.

*Wilson Shannon,* for defendants in error.

*Thacher,* who argued the case in Supreme Court in addition to the points made for defendants in the preceding case, submitted:

1st. The words "levy," "sale," "execution" and "forfeiture," are familiar words with fixed meaning, except the word "sale," which signifies the disposition of property by various methods. This ambiguity gives rise to all the difficulties in this case.

2d. Levy: defined the seizure of property, the raising of money for which execution has issued. It is simply the

act whereby the officer takes control, of property of the judgment debtor by virtue of the execution, for the purpose of sale. This is one step towards fulfilling the mandate of the court whence the execution issued.

3d. "Execution" as used in the treaty means the writ whereby the officer is authorized to carry into effect the judgment of a court; the process by which seizure is made to satisfy by sale the judgment. While at common law there were various kinds of executions, there were none that touched the title to land, as to pass it. (4 *Kent Com.*, 429.) It is a creature of modern legislation. "It is the life of the law" especially in this country; the effective instrument whereby the finding and judgment of the court is consummated—based upon an adjudication—follows a contest wherein there was a plaintiff and a defendant, an accused and an accuser, and only affects the property of the losing party.

4th. The exact force of "forfeiture" used in the treaty it is difficult to determine. As to lands there are four kinds of forfeitures, viz: by commission of crime, by alienation contrary to law, (now obsolete,) by non-performance of conditions annexed to the estate, and by waste. The last kind cannot be intended, for the Miamis could hardly be tenants to themselves. (*Bouv. L. Dic.*, "*Forfeiture*," 4 *Kent Com.*, 426.) The word as used can only refer to treason, whereupon it should not be in the power of the future state to declare these lands forfeited to the state for the acts of patentees.

As to all these questions it is evident there can be neither levy, execution nor forfeiture, except they be founded on judicial proceedings in which the grantee of the particular lands sought to be used or taken was a party. They are all founded on the idea of the broken obligation of some kind of the grantee, which the courts would enforce against him. The provision in the treaty exempts these lands from the operation of these adjudica-

tions taken in its broadest latitude. It is insisted, however, that there is nothing in the constitution or laws of Kansas or in the act of admission binding on the state, or in the constitution and laws of the United States, that makes this treaty provision obligatory on the state or deprives the state courts of their jurisdiction. *United States* v. *Cisna*, 1 *McLean*, 260.

But giving these terms their broadest construction, they are simply exemption from the incurred obligation of the grantee. They free his land from the payment of his debts or liabilities.

5th. If the word " sale " used in the treaty is to be construed with the other accompanying words, and as they obviously must be construed, the intent is manifest. The word sale simply refers to the concluding act of the officer who has levied upon the land by virtue of his execution and in pursuance thereof, *sells* it.

It is certain that " execution and levy " refer to judicial proceedings; they would be worthless without a sale; the natural order of the proceeding, is execution, levy, sale. This construction is a fair one ; the most natural, and best fulfills the doctrine of construction ; makes the phrases all consonant, one with the other, and leaves the law itself valid.

It is a *judicial* " sale " under and by virtue of a judgment against the grantee that is provided against. The reason is obvious; it was to prevent the improvident grantee from incurring needless obligations on the strength of his ownership.

But a tax is not assessed upon the individual ; it is upon the land itself. No responsibility of the individual is looked to. If the tax on the land fails, no recourse is had or left on the owner, yet a lien by law is established on the land itself.

That all kinds of sales are not prohibited by the treaty is evident from the clause preceding the one in question,

providing that the grantee may make voluntary " sales " under certain restrictions.

If the prohibitory clause in question includes *all* " sales," this preceding clause and its restrictions, amount to nothing.   It will not be presumed that it was intended, in two clauses, to provide for the same thing.   Besides, if this is to be held a prohibition to tax these lands, then they unmistakably come under the doctrine announced in State of New Jersey *v.* Wilson, (7 Cranch, 164.)   It is a covenant running with the land and is good in the hands of purchasers.

*Shannon*, for defendants in error, contended that the word " sale " used in the clause of the treaty in question, included all sales,not only judicial and voluntary, but those made pursuant to any law or for non-payment of taxes, except those sales otherwise in the treaty provided for ; that the whole treaty was to be taken and construed together, and that as there was nothing in the treaty indicating that the lands might be taxed, that the use of the word sale precludes the idea that it was the intent that they should be taxed.   Exemption from sale for taxes, is virtually an exemption from taxation.   Besides, the use of the word " execution " and " levy," are sufficient to prohibit judicial sales.

*By the Court*, CROZIER, C. J.

There is but one point of difference between this case and the case of Charles Blue-Jacket *v.* The Commissioners of Johnson County, decided at the present term.   The treaty with the Shawnees provides that Congress may authorize the issuing of patents for the selected lands under restrictions, under which the restriction adopted was that the lands should never be sold or aliened by the grantees or their heirs, without the consent of the Secretary of the Interior.   The treaty with the Miamis, after

a similar clause, provides that the lands so patented, should not be liable to levy, sale, execution or forfeiture. The patents contain the same restriction that is inserted in the patents to the Shawnees. In the case referred to, it was held that the restriction in the patent did not operate to exempt the lands from taxation. In this case it is contended that the provision above quoted has that effect. Whether these lands are taxable depends upon the construction to be given the phrases levy, sale, execution or forfeiture. They would ordinarily be held to refer to judicial proceedings, yet the first two might be appropriately used with reference to taxation, consequently the sense in which they were intended to be understood, cannot be satisfactorily determined from the words alone; other lights, must, if accessible, be made available to that end. The treaty with the Miamis was executed January 5th, 1854, with the Wyandottes, January 31st, 1855, with the Chippewas, February 22d, 1855, and with the Winnebagoes, February 24th, 1855, and all of them were negotiated by George W. Manypenny, Esq., as commissioner, on the part of the United States, who at the time was the United States Commissioner of Indian Affairs. A comparison of the language used in those treaties upon the subject under consideration, ought to furnish some guide in the interpretation of the phrase cited from the treaty with the Miamis. The language used in each is as follows: In the treaty with the Wyandottes, "none of the lands to be thus assigned and patented to the Wyandottes, should be subject to taxation for a period of five years from and after the organization of a state government over the territory where they reside, and those of the incompetent classes shall not be aliened or leased for a longer period than two years, and shall be exempt from levy, sale or forfeiture, until otherwise provided by state legislation, with the assent of Congress."

47

With the Chippewas, "said tracts to be exempted from taxation, levy, sale or forfeiture."

With the Winnebagoes, precisely like that with the Chippewas.

These differ from that with the Miamis only in that the word "execution" is omitted, and the word "taxation" supplied. That this was the result of accident or inadvertence, certainly ought not to be presumed, nor will it be so presumed after a careful examination of the provision. When used with reference to judicial proceedings in civil matters, the words "levy and sale" are equivalent to the word "execution." Each expression means the subjecting of property to the satisfaction of a judgment, and the use of both would be tautology. In the formation of the last of these treaties, it cannot be doubted that the intention was to exempt the lands from judgment sale. If such was the intention, the expression of it must be found in the exemption from "levy and sale." The word "execution" having been omitted there is no other word or words left that will express such intention. That such was the purpose is further made manifest by the addition of the word "taxation." Exemption from taxation necessarily implies exemption from sale for taxes, and no other word is necessary to that end. Having provided that the lands shall be exempt from taxation, to provide also that they shall not be subject to sale for taxes, would be a work of supererogation. Such an undiscriminating use of language ought not to be attributed to any man in public position, much less to a man of Mr. Manypenny's intelligence.

The same remarks apply with equal if not greater force to the use of the word "forfeiture." If the lands were not to be subject to sale for taxes, they could not be forfeited for their non-payment, and besides, the word "forfeiture" properly understood, can have no application to taxation. Lands are not forfeited by the non-payment of

Commissioners of Miami County v. Wan-zop-pe-che and others.

taxes. The state by such omission acquires no title to them. Taxes like a judgment of a court of record, are a mere lien upon the land, to be enforced in both instances by a sale, and the title passes and can pass by such sale alone. There can be no redemption by the owner until after a sale, for the reason that until that time the title is still in him, and there is nothing to be redeemed. After they are due and before the sale, he may pay the taxes and discharge the lien, but there is in no sense a redemption. The state or other authority imposing the taxes, may become the purchaser at the sale, but until they are so purchased, no title to the lands vests in such authority. Until there be a sale every vestige of title remains in the individual, and the lands are subject to a mere lien for the taxes. It need not be argued that the sale is in no sense a forfeiture.

We think, therefore, the conclusion is irresistible, that the words "levy, sale and forfeiture" as used in the three treaties referred to, have reference to judicial proceedings alone. What good reason can be given for attributing to them a different signification where they occur in the treaty with the Miamis. They were used with reference to like subject matters, were very probably written by the same hand, were approved by the same President, under the advice of the same Senate, and all was done within a period of eight months, and there is no presumption or rule of construction that we are aware of, requiring a different interpretation. Under such circumstances the court feels compelled to attribute to them a like meaning in all the treaties; we are of opinion, therefore, that the lands in question are subject to taxation under the laws of the state, and that the District Court erred in rendering judgment in favor of the plaintiffs below. That judgment will be reversed.

All the justices concurring.